## THE BATES MACHINE COMPANY

*v.*

## ALBERT J. BATES *et al.*

*Opinion filed October 24, 1901.*

1. CONTRACTS—*when contract is not an agreement to assign "in gross" all inventions.* A contract between a manufacturer and a third person to form a corporation for the purpose of enlarging the business, by which the manufacturer agrees to assign all his "patents now in existence and all inventions hereafter made" to the corporation, and to devote his energies and inventions to the business the same as he is "now doing," contemplates only such inventions as relate to the particular business, and is not void as an assignment, in gross, of all designs and inventions.

2. SAME—*when agreement to form a partnership or corporation is not void for want of mutuality.* An agreement to form a corporation is not void, for want of mutuality, because one of the parties contributes capital while the others contribute their skill and gifts of invention instead of money.

3. SPECIFIC PERFORMANCE—*specific performance is not a matter of right.* A prayer for specific performance is addressed to the sound judicial discretion of the chancellor, and will not be granted where specific enforcement of the contract would work an injustice.

4. INVENTIONS—*invention may, in equity, become the property of the inventor's employer.* An inventor may, for a consideration, legally contract to devote his skill and genius to an invention to be the property of his employer when completed and patented, and under a contract to that effect the invention becomes, in equity, the property of the employer.

*Bates Machine Co.* v. *Bates,* 87 Ill. App. 225, affirmed.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Will county; the Hon. R. W. HILSCHER, Judge, presiding.

GARNSEY & KNOX, (L. L. BOND, of counsel,) for appellant.

C. W. BROWN, (JOHN R. BENNETT, of counsel,) for appellees.

Mr. JUSTICE BOGGS delivered the opinion of the court:

The appellant company filed its bill in chancery in the circuit court of Will county, against the appellees, for a decree commanding the appellees to assign to the appellant company a certain patent for a woven wire fence, and a certain other patent for a machine to weave such woven wire fence. The appellees, defendants to the bill, filed answers thereto, and the appellee the Consolidated Steel and Wire Company filed its cross-bill against the Bates Machine Company, as the sole defendant, setting up its claim that it was the owner of the patents for the wire fence and for the machine to manufacture the same, and alleging that the defendant to the cross-bill, the Bates Machine Company, was engaged in building certain machines covered by said patent for another company, and that the same, after completion, would be removed out of the jurisdiction of the court. The cross-bill prayed for temporary injunction against the removal of said machines, and also for perpetual injunction against the Bates Machine Company from any further construction or work upon the machines protected by said patent and from delivering them to the company said to have ordered them; from making or using them or like machines; from asserting any right to the patent for said machine, and praying that the machines already constructed be delivered up to the complainant in the cross-bill to be destroyed, and that the complainant in the cross-bill might have such other and further relief as the nature of the case demanded. An answer was filed to the cross-bill, and replications to the answers to the original bill were also filed. After the hearing of the cause the court entered a decree dismissing the original bill for want of equity, declared the equities were with the complainant in the cross-bill, and enjoined the Bates Machine Company from any futher construction or work upon the machines mentioned therein as being under con-

tract for other parties than the complainant in the cross-bill, from delivering said machines, and from making or making any use of the same or like machines. It was further decreed by the court that the complainant in the cross-bill was the owner, both in law and in equity, of patent No. 577,639, which is the patent for the machine for making the fence as originally designed; No. 591,996, the patent for the improved machine for making the fence, and No. 561,193, the patent for the woven wire fence. The Appellate Court for the Second District affirmed the decree of the circuit court, and a further appeal has been perfected to this court.

Prior to the 28th day of January, 1888, appellee A. J. Bates, and his brother, W. O. Bates, were engaged in business in the city of Joliet as inventors and manufacturers of machinery for making wire nails, wire fencing, and in the business of repairing machinery. They were the owners, jointly, of two patents for making barb wire fencing, and were desirous of extending and enlarging their business. They had acquired, in the way of machinery, tools and appliances, property of the inventoried value (including some book accounts) of $10,000. On the day last named they made a written agreement with one Joseph Winterbotham, as follows:

"A. J. BATES.                              W. O. BATES.
        BATES BROS., MACHINISTS.

Special Machinery of all Kinds, Jobbing and Repairing.—Corner
        of Washington and Desplaines Streets.—Inventors
              and Manufacturers of Special Machinery.

JOLIET, ILL.............*18*....

"Be it known that A. J. Bates and W. O. Bates, under the name of Bates Bros., being desirous of extending and enlarging their present business, have united their interests with Joseph Winterbotham, of Joliet, Illinois, under the following: Said A. J. and W. O. Bates put their entire business, book accounts, notes, machinery, patterns, stock, etc., manufactured and unmanufactured, also all patents now in existence and all inventions hereafter made by either the said A. J. or W. O. Bates. In consideration of the above, Joseph Winterbotham agrees to put

in $10,000,—$5000 being hereby acknowledged, the remainder being paid as needed. It is the intention and full understanding of the parties hereto that they will at earliest practicable time organize a stock company with a capital of $20,000, said capital to be made up and fully represented by the assets above enumerated and the stock distributed as follows: ($\frac{1}{4}$) one-quarter to A. J. Bates; ($\frac{1}{4}$) one-quarter to W. O. Bates; ($\frac{1}{2}$) one-half to Joseph Winterbotham or his assigns. The name of the company to be known as Bates Bros. Company, or such other name as may be agreed upon.

"The officers of said company will be as follows: Joseph Winterbotham, president; J. R. Winterbotham, vice-president; A. J. Bates, secretary and treasurer, with salary of ($1200) twelve hundred dollars for the first year and ($1500) fifteen hundred dollars for second year, provided business pays fifteen per cent or over from its organization. W. O. Bates to be superintendent, with a salary same as A. J. Bates, and the raise second year subject to the same conditions. A. J. Bates and W. O. Bates to devote their energies and inventions to the business, same as they are now doing. This agreement to be in effect from 28th day of January, 1888.    W. O. BATES,
    ALBERT J. BATES,
    JOSEPH WINTERBOTHAM."

In pursuance of this contract a corporation, bearing the name of "The Bates Machine Company," was incorporated under the laws of Illinois, the final certificate being recorded February 28, 1888. The capital stock of the company was $20,000. It is admitted this is and was the corporation contemplated by the agreement. The two patents which were owned by the Bates brothers jointly at that time were transferred to the corporation, and their machines and machinery, appliances and tools, were also transferred. The stock in the corporation was issued in accordance with the terms of the contract of January 28, 1888, and the $10,000 stipulated to be paid by Mr. Winterbotham was also paid. The business of the Bates Machine Company increased and proved profitable to such an extent that on the 3d day of February, 1891, the capital stock was increased to the sum of $100,-000, which was divided and apportioned to the said A. J.

Bates and W. O. Bates and Joseph Winterbotham in the proportions specified in the agreement. On the 25th day of September, 1895, appellee A. J. Bates, who still held the office of secretary and treasurer of the company, as provided in the agreement, but at an increased salary of $2100 per annum, voluntarily resigned both of the positions and was appointed consulting engineer for the company, at an annual salary of $1200.

On the 28th day of May, 1895, while the said A. J. Bates was occupying the position of secretary and treasurer of the Bates Machine Company, as provided in said agreement of January 28, 1888, between himself, W. O. Bates and Joseph Winterbotham, said A. J. Bates entered into a contract with one Cory E. Robinson, to the effect that the contracting parties should form a corporation for the purpose of manufacturing and marketing woven wire fencing; that the said A. J. Bates, who had formed in his mind a woven wire fence of a new design and pattern, should invent, design and patent a machine for manufacturing said woven wire fencing, and would improve and perfect the same, and, if possible, obtain a patent from the United States patent office therefor, and also obtain a patent for the woven wire fence which he had in contemplation, and would transfer both patents, when so obtained, to the said corporation so to be formed as aforesaid, in full payment for one-half of the capital stock thereof, to-wit, $50,000. Other conditions and terms of the agreement need not be adverted to. The corporation was organized pursuant to this agreement and given the name of "The Standard Railroad and Farm Fence Company," with a capital stock of $100,000, owned by A. J. Bates and Cory E. Robinson in equal parts, except that the wife of each of them owned one share of the stock. Prior to the execution of said agreement between said A. J. Bates and said Robinson, said A. J. Bates had invented and designed a woven wire fence and a machine for the manufacture thereof, drawings of such fence be-

ing attached to the agreement. He proceeded at once, after the making of the agreement, to improve and perfect the proposed machinery to make such a fence and to cause a machine to be manufactured, in order that it might be determined, by actual operation, whether the proposed wire fence would be a success. A machine was constructed by the Bates Machine Company under an order given in the name of C. E. Robinson, but the wire fence proved a failure, the design and plan thereof being faulty. A. J. Bates proceeded to remedy the defects in plan of the proposed wire fence and to manufacture another machine to manufacture such fence after the new pattern and design. While so engaged, and while said A. J. Bates was still secretary and treasurer of the appellant company, said A. J. Bates, said Cory E. Robinson and said Standard Railroad and Farm Fence Company, on the 14th day of September, 1895, entered into a contract with the appellee the Consolidated Steel and Wire Company to sell to said Consolidated Steel and Wire Company certain machinery, material and supplies then in the plant of the Standard company, and, "also, upon conditions hereinafter named, a certain woven wire fence machine now being built under the superintendence of A. J. Bates, together with such patents as may be obtained on either the machine or its product," for the consideration of $80,000 and the actual cost of the material and supplies. The Consolidated company also agreed to assume certain contracts made by A. J. Bates. The agreement provided the Standard company should pay the expense incident to the completion of the woven wire fence machine, except the compensation of A. J. Bates for his time, skill and services, as to which the contract provided: "It is also understood that until the completion of this machine A. J. Bates is to be in the employ of the Consolidated Steel and Wire Company under a salary of four thousand ($4000) dollars per year, and he is to give his entire time, services and skill to the early

completion and perfection of said machine and the business of said Consolidated Steel and Wire Company." A. J. Bates proceeded to complete the machine and to make the newly designed woven wire fencing. It proved satisfactory, and a patent was obtained for the woven wire fencing and also a patent was secured for the machine to make such fencing. These patents were issued to the Consolidated Steel and Wire Company, "on the application of A. J. Bates, assignor."

The original bill was filed in the cause to procure the specific performance of the contract of January 28, 1888, and for a decree directing and requiring the Consolidated company and said A. J. Bates and Robinson to assign these two patents to the appellant, the Bates Machine Company, as in compliance with the undertaking of said A. J. Bates in said contract of 1888. The ground upon which this relief is claimed is, that the contract of January 28, 1888, entered into between said A. J. and W. O. Bates and said Joseph Winterbotham, contemplated the formation of the Bates Machine Company, a corporation, and the transfer to said corporation of all patents designed and invented by the said A. J. Bates; that said A. J. Bates, while occupying the position of secretary and treasurer for the said Bates Machine Company, and being a stockholder and director therein, and while the obligation of said contract that said Bates Machine Company should have the benefit of all inventions made by him was in full force and effect, invented the subjects of the two patents herein involved, and that the beneficial interest and right in each of said inventions, under said contract of 1888, should, in equity, belong to and be enjoyed by the said Bates Machine Company, and that said Consolidated Steel and Wire Company was not a *bona fide* purchaser or assignee of said patents from the said A. J. Bates, but was chargeable with notice of the rights and interests of the said Bates Machine Company therein, and was an assignee and purchaser with due notice.

The appellees rely upon a number of judicial decisions, some to the effect that contracts to assign "in gross" all designs and inventions, on grounds of public policy, will not be enforced specifically or by way of damages awarded for breach thereof; others to the effect that such contracts do not address themselves favorably to a court of equity.

We do not regard the stipulations in the contract of January 28, 1888, as an agreement on the part of A. J. and W. O. Bates to assign "in gross" the future labor, as inventors, of both or either of said Bates brothers. The contract related to the business in which said parties, through the means of the corporation subsequently to be formed, intended to engage. The purpose of the contracting parties was, as the contract expressly states, to extend and enlarge the business in which the co-partnership of Bates Bros. was engaged. The brothers Bates expressly stipulated to devote their energies and inventions to the business of the proposed corporation, "the same as they are now doing" for the firm of Bates Bros. The inventions contemplated by the parties, and which, under the contract, it became the duty of the said brothers Bates, and each of them, to assign to the corporation, were such as pertained to the special business in which said parties, through the medium of the corporation, intended to engage. Inventions not relating to the special business of the Bates Machine Company, under a proper construction of the contract, would not fall under the operation of the contract, but would remain the property of the inventor. It was not within the purview of the contract that the Bates Machine Company should become interested in a patent on an article or machinery in no wise connected with the business it was incorporated to perform, and the contract left the inventive genius and power of either A. J. or W. O. Bates free to act in all directions than that in which the Bates Machine Company was engaged.

Nor is the contract incapable of enforcement on the ground, if operative at all, it constituted a "mortgage on the brains and inventive genius" of A. J. and W. O. Bates during the time of their natural lives, as is most strenuously urged. The contract stipulated they were to become the owners of certain shares of stock in the corporation and were to devote their energies and inventions to the business, (of the proposed corporation,) "same as they were now doing" to the business of Bates Bros. It is usual in agreements for the formation of a co-partnership to fix a period for the determination thereof. If the articles of co-partnership do not specify the duration thereof it may be brought to an end at the election of any of the partners, unless formed for a particular enterprise and to effect a particular purpose, in which latter instance the completion of the enterprise or the accomplishment of the purpose will govern the duration of the co-partnership. (17 Am. & Eng. Ency. of Law,—1st ed.— p. 1096.) The agreement of January 28, 1888, entered into by A. J. and W. O. Bates and Mr. Winterbotham, though for the formation of an incorporated company, as between the parties thereto, carried into the administration of the business of the corporation the objects, covenants and undertakings of the various parties to the agreement. The corporation was not to be devoted to the completion of any particular enterprise or purpose, but to the prosecution of a general business in its particular line. The provisions with relation to the salary fixed to be paid to A. J. Bates, who was to serve as secretary and treasurer, and to W. O. Bates, as superintendent, contemplated the continuation of the enterprise for at least two years. After that period either of the parties had full right to absolve himself from the contractual relations created by the agreement. But to accomplish this, affirmative action on his part was essential,—either an actual declaration made to the other co-contracting parties, or some acts brought to their knowledge amounting to such

a declaration, from which such notice would be imputed, in law, as effectually as by an express formal declaration. The other parties to the contract were entitled to know that such course had been determined upon. A. J. Bates could not be permitted to enjoy the benefits of the agreement and secretly absolve himself from the duties and obligations on his part.

Nor is the contract void for want of mutuality. It is true that Mr. Winterbotham is not required to assign any inventions he may make to the corporation. Mr. Winterbotham's contributions to the capital of the firm were in the shape of money. The Bates brothers brought experience and the gifts of invention. It is not essential to the validity of a contract for a co-partnership that each partner shall render the same services to the business of the firm or make like contributions to the capital. One may contribute capital, another, or others, skill and experience. A particular contract is not wanting in mutuality because the contributions of the members to the capital stock or business of the firm are not the same in kind and nature. But in view of the fact the interests of third parties are involved, and are here believed to be paramount to those of the said contracting parties, we have not investigated the record with the view of determining the right and equity of the matter as between the said contracting parties. The decree must be affirmed for the reason we think under the circumstances of the case it would be inequitable to require the Consolidated Steel and Wire Company to assign the patents to the Bates Machine Company.

A prayer for specific performance of a contract is addressed to the sound judicial discretion of the chancellor. The discretion of the court is to be controlled by principles of justice and equity, and specific performance will not be decreed where, in the particular case, the enforcement of the performance would be an act of injustice. *East St. Louis Railway Co.* v. *City of East St. Louis*, 182 Ill. 433.

The Consolidated Steel and Wire Company entered into a contract with the Standard Railroad and Farm Fence Company and Robinson and A. J. Bates on the 14th day of September, 1895, whereby it became the purchaser of a machine for making woven wire fence then in course of construction under the superintendence of A. J. Bates, and obtained the obligation of A. J. Bates, said Robinson and said Standard Railroad and Farm Fence Company that the patents to be obtained on the said machine, when completed and perfected, and on the wire fence to be manufactured by said machine, should be assigned to said Consolidated Steel and Wire Company. By the same agreement the Consolidated Steel and Wire Company employed the said A. J. Bates, under a salary of $4000 per year, to give his entire and exclusive attention, services and skill to the completion and perfection of the said machine and fence. On the execution of this contract the said Consolidated company paid the sum of $40,000, (in cash $19,271.92, balance in payments to creditors of the Standard Railroad and Farm Fence Company and in settlement of accounts of said company,) and obligated itself to pay the additional sum of $40,000 when the said machine should be completed and the device for the fence and said machine patented and the patents assigned to the said Consolidated company. When the contract was entered into, the said Bates Machine Company was engaged in the construction of the machine for making the woven wire fence under an order given by said Cory E. Robinson. A. J. Bates was in charge of the work, which was being done in the plant of the Bates Machine Company, and the Bates Machine Company was receiving compensation for the work from Robinson and said Standard Machine Company. The said A. J. Bates, in compliance with the obligations of the contract with the said Consolidated company, as the employee of that company under a salary at the rate of $4000 per year, continued to devote his services and

skill to the completion and perfection of said machine and the plan and design of the fence the machine was constructed to manufacture. The officers of the Consolidated company came, from time to time, to the plant of the Bates Machine Company to see how the work was progressing, and paid A. J. Bates' salary regularly. In January, 1896, the work on the machine had progressed sufficiently to develop the fact that the fence to be constructed upon it would be too weak for actual use. The officers of the Consolidated company were notified, and Mr. Edenborn, president of the Consolidated company, came to the plant of the Bates Machine Company, and after a consultation with A. J. Bates it was decided the fence could not be used. A. J. Bates insisted he knew wherein the defect lay and that he could design and build another machine which would weave a fence that would answer the purpose. He was thereupon directed by the Consolidated company to proceed and make the new machine, and he devoted his time, skill and energy to the new machine as an employee of the Consolidated company, under the annual salary as aforesaid. This new machine was constructed in the plant of the Bates Machine Company, and that company rendered its bills for the work to Robinson and the Standard company. On the 12th day of June, 1896, the Consolidated company was formally notified the machine had been perfected and completed and was ready to be delivered in pursuance of the contract. The contract provided for a test of said machine by the operation thereof for a period of thirty days. The actual test of the machine, which consisted of weaving fence thereon, was entered upon in the Bates Machine Company's works, the wire being furnished by said Consolidated company, and the fence, as woven, being removed by the Consolidated company. The test was completed on the 25th day of July, 1896. The machine and the fence were satisfactory to the Consolidated company. On the 7th day of July, 1896, while the test

was in progress, the Bates Machine Company notified the Consolidated company that it claimed all inventions made or patented by said A. J. Bates, and notified it that all contracts for inventions for woven wire fencing, or machinery for making the same, should be made with the Bates Machine Company, and not with A. J. Bates. The Consolidated company, notwithstanding such notice, paid said A. J. Bates and said Robinson and the Standard Railroad and Farm Fence Company the remainder of the amount due under the contract, to-wit, the sum of $40,000, and said A. J. Bates made his applications for the patents in question as assignor of the said Consolidated Steel and Wire Company, and the patents, being those in controversy, were so issued to that company as assignee of said A. J. Bates. The Consolidated company had paid but one-half ($40,000) of the purchase money for the said patents when it received the notice from the Bates company that the latter corporation claimed the inventions and patents made or issued to said A. J. Bates, and paid the remainder of the purchase money ($40,000) after receiving such notice, and the appellant insists, that as the latter payment was made after due notice, the Consolidated company cannot be regarded as a *bona fide* purchaser of the patents.

The rule seems to be, that if one otherwise entitled to be regarded as a *bona fide* purchaser has paid a part, only, of the purchase money before notice of the rights of others, he will be protected, in equity, to the extent of the payments made before the receipt of the notice, but not for any payments made thereafter, and will not be protected as a *bona fide* owner. (14 Am. & Eng. Ency. of Law,—2d ed.—293.) Though recognizing the full force of the rule, it would not follow that a court of equity would enforce a specific performance in favor of the party serving such notice. As before remarked, the specific performance of a contract cannot be demanded as a matter of right, but is decreed within the judicial dis-

cretion of the court and upon principles of justice and equity.

We think the Consolidated company, though not falling strictly within the category of *bona fide* purchasers, should not be required to surrender the patents in question to the Bates Machine Company, but that the Bates Machine Company, if it has any right of action in the premises, should be remitted to its remedy (legal or equitable, as it may be advised,) against the said A. J. Bates or Robinson and the Standard Railroad and Farm Fence Company.

It is not contended the Consolidated company, when it entered into the contract to purchase the said patents and paid the sum of $40,000 on said contract, had any notice or knowledge of the claim of the Bates Machine Company to the inventive services and skill of the said A. J. Bates. The Consolidated company at the same time, and clearly with full belief it had the right to do so, and without notice to the contrary, employed said A. J. Bates to complete and perfect the said machine and the said fence to be manufactured upon it, and to complete the invention for it, and the inventions and the patents thereon to be the property of said Consolidated company. While the law inclines to the rule that an invention shall be the property of the inventor, yet a man of inventive mind may, for a consideration, legally contract to devote his skill and inventive genius to an invention to be the property of his employer when completed and patented, and under a specific contract to that effect the invention may, in equity, become the property of the employer. (*Joliet Manf. Co.* v. *Dice*, 105 Ill. 649.) Any other rule would deny inventors the full benefit of their peculiar gifts and powers.

The Bates Machine Company was, when the Consolidated company made this contract, engaged, under a contract with Robinson or in fulfillment of an order given by Robinson, in building and making the machine in

question to make the fence. The contract between the said A. J. Bates, Robinson and the Standard Railroad and Farm Fence Company and the Consolidated company, provided said Robinson, A. J. Bates and the Standard Railroad and Farm Fence Company should defray the expense of building the machine. The Bates Machine Company rendered bills for the work to Robinson and received payments in checks, some of which were signed by Robinson individually, but many of such checks were signed by "The Standard Railroad and Farm Fence Company, by A. J. Bates." In presenting one of the itemized bills for the work to Robinson, before the contract was made with the Consolidated company, the Bates Machine Company included a charge for the time of A. J. Bates. The superintendent of the Bates Machine Company was then informed that A. J. Bates was practically the owner of one-half of the capital stock in the Standard Railroad and Farm Fence Company, and was under obligations to render his services about the work without charge, and the result was the time charged for his work was stricken out. A similar question arose after the contract was made between A. J. Bates, Robinson and the Standard company with the Consolidated company. The time of A. J. Bates was included in bills or a bill rendered by the Bates Machine Company for work done for the Consolidated company, and on complaint the item was stricken out of the bill. W. O. Bates, secretary and treasurer of the Bates Machine Company at the time of the hearing below, and prior to September 25, 1895, superintendent for said Bates company, would not, on his examination as a witness, deny but that such charge was withdrawn because A. J. Bates was receiving an annual salary as the employee of the Consolidated company and that the company was entitled to his services by reason of such employment. The Bates Machine Company made no claim to any right or interest in the machine, or the fence to be manufactured thereon, until after the said A. J.

Bates, as an employee of the Consolidated company, had, in the plant of the Bates Machine Company, under the circumstances as aforesaid, constructed the machine, tendered it as completed, and until after the officers of the Consolidated company had been for some days engaged, in the works of the Bates Machine Company, in inspecting the workings of the machine in the actual operation of building the woven wire fence out of wire supplied by the Consolidated company for the purpose.

What duty or course of action should equity require to have been taken by the Consolidated company on receiving the notice of July 7, 1896, that said Bates Machine Company claimed the right to the machine and the invention of the fence to be constructed by the machine? It had in good faith contracted for the machine and the inventions; had paid a large sum of money on the contract; had caused the work of making the machine and of planning and devising the invention of the fence to be carried forward by A. J. Bates, as its salaried employee, without objection or complaint on the part of the Bates Machine Company, though under circumstances well calculated to demand action on the part of the Bates Machine Company if it intended to advance any claim to the machine or the fence or the patents thereon. When the notice was received an actual test of the machine was in operation, and the officers of the Consolidated company were then, and for some days had been, at the works of the Bates Machine Company superintending the work of the machine and the test thereof. No principle of equity or rule of law or morals would justify a decree declaring it became the duty of the Consolidated company to abandon the test then being made of the machine, refuse to make payment of the remainder of the contract price, and decreeing that the Consolidated company should assign the patents afterwards obtained on the fence, and the machine to make the same, to the Bates Machine Company. The Bates Machine Company has

no just grounds upon which to base a bill for a decree requiring the assignment of these patents to it. Whether it has cause of complaint and right of action against A. J. Bates in the premises is not within the purview of the pleadings and the evidence in the record.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*