OF THE

# APPELLATE COURT OF ILLINOIS

### DURING THE YEAR 1905.

---

### Albert J. Bates v. Bates Machine Company.

#### Gen. No. 4,467.

1. CASE—*when action of, lies.* Case lies to recover damages resulting from a breach of a written contract.

2. CASE—*when not barred by Statute of Limitations.* An action of case instituted to recover damages for the breach of a written contract may be brought within five years from the time the cause of action arises.

3. INVENTIONS—*when should be assigned.* An inventor who by virtue of his partnership contract was obligated to put into the partnership business all patents at the time owned and afterwards made by him, is, likewise, obligated to assign to a corporation succeeding, by his consent, to said partnership and its rights, all future inventions made by him within the scope of the businesses of such partnership and corporation respectively.

4. INVENTIONS—*duty of party under contract to assign.* Where a party is under contract to assign all future inventions to another, it is his duty to make full disclosure to such other of all inventions made and developed by him.

5. DECEIT—*when action lies for.* Where by contract a party is obligated to assign an invention to a corporation but fraudulently assigns the same to another and independent corporation, which successfully defends its title thereto upon the ground of its innocence in acquisition, he is liable in an action of deceit to such first-named corporation. in the sum received by him for the invention so wrongfully conveyed, with interest thereon from the date of the receipt thereof.

6. CONTRACT—*what does not absolve party from obligations of.* A party is not absolved from the obligations of a contract merely by the

(563)

doing of acts which may appear inconsistent with an intention to continue such contract in force; if such inconsistent acts can in any event be taken as in effect abrogating such contract, they must be acts of no uncertain character in their inconsistency.

7. CONTRACT—*what does not cancel*. A contract by which a stockholder in a corporation becomes an officer thereof by which he agrees to serve as such officer and to assign to it all inventions made by him in the future, all for a single consideration, is not terminated by the voluntary resignation of such stockholder as such officer, in the absence of a provision in the contract providing that such result should be accomplished by a resignation.

Action on the case. Appeal from the Circuit Court of Will County; the Hon. DORRANCE DIBELL, Judge, presiding. Heard in this court at the October term, 1904. Affirmed. Opinion filed May 27, 1905.

C. W. BROWN, JOHN R. BENNETT and CALHOUN, LYFORD & SHEEAN, for appellant.

C. B. GARNSEY and JOHN H. GARNSEY, for appellee.

MR. PRESIDING JUSTICE FARMER delivered the opinion of the court.

Prior to January 28, 1888, A. J. Bates, appellant here, and his brother, W. O. Bates, were owners of and engaged in conducting a shop for the manufacture, repair and sale of machinery. The business was conducted as a partnership under the firm name of Bates Brothers. They had but little capital, but were shrewd, ingenious and progressive men, A. J. Bates especially having a high order of talent for invention. On said 28th day of January, 1888, the Bates Brothers and Joseph Winterbotham entered into the following written agreement:

"BATES BROTHERS,
Machinists.
Special Machinery of all Kinds, Jobbing and Repairing,
Corner Washington and Desplaines Street.
Inventors and manufacturers of special machinery.
JOLIET, ILL., 1888.
Be it known that A. J. Bates and W. O. Bates, under the name of Bates Brothers, being desirous of extending and enlarging their present business, have united their interests with Joseph Winterbotham of Joliet, Illinois, under the following:

Bates v. Bates Machine Co.

Said A. J. and W. O. Bates put in their entire business, book accounts, notes, machinery, patterns, stock, etc., manufactured and unmanufactured, also all patents now in existence, and all inventions hereafter made by either the said A. J. or W. O. Bates. In consideration of the above Joseph Winterbotham agrees to put in ten thousand dollars, five thousand dollars being hereby acknowledged, the remainder being paid as needed. It is the intention and full understanding of the parties hereto that they will, at earliest practicable time, organize a stock company with a capital of twenty thousand dollars, said capital to be made up and fully represented by the assets above enumerated, and the stock distributed as follows: one-quarter to A. J. Bates, one-quarter to W. O. Bates, one-half to Joseph Winterbotham or his assigns. The name of the company to be known as Bates Brothers Co. or such other name as may be agreed upon. The officers of said company will be as follows—Joseph Winterbotham, Pres., J. R. Winterbotham, V. Pres., A. J. Bates, Secretary and Treasurer, with a salary of ($1200) twelve hundred dollars the first year and ($1500) fifteen hundred the second year provided business pays 15 per cent. over from its organization. W. O. Bates to be Superintendent with a salary same as A. J. Bates and the raise second year subject to same conditions. A. J. and W. O. Bates to devote their energies and inventions to the business same as they are now doing. This agreement to be in effect from the 28th day of January, 1888.

W. O. BATES,
ALBERT J. BATES,
JOSEPH WINTERBOTHAM."

In pursuance of that agreement, in February of the same year, the business was incorporated as the Bates Machine Company, with a capital stock of $20,000. A. J. and W. O. Bates each sold to E. E. Wolcott five shares of their stock in 1891. In 1893, the capital stock was increased to $100,000, and the increase distributed proportionately among the then stockholders. Joseph Winterbotham was elected president, A. J. Bates secretary and treasurer, and W. O. Bates superintendent of appellee. A. J. Bates was continued in the office of secretary and treasurer until the 25th day of September, 1895, when he resigned that office and was elected consulting engineer of appellee. His salary as secretary and treasurer was raised from time to time un-

til at the time of his resignation he was receiving $2,100 per annum. The office of consulting engineer had not existed before the meeting of September 25, 1895, at which A. J. Bates resigned his office of secretary and treasurer. The record of that meeting shows the office was created at that time, "the duties of such office to be to assist when desired in taking orders and to give his best efforts to the advancement of the interests of the Bates Machine Company." The salary of the consulting engineer was fixed at $100 per month beginning October 1, 1895. On the 28th day of May, 1895, Cory E. Robinson gave the Bates Machine Company a written order for one automatic woven wire fence machine of a design like that shown on blue prints attached, the machine to be built "according to the design and plan of A. J. Bates of Joliet, Ill., and under his direction." Robinson was to pay fifty cents an hour for labor in constructing the machine, three cents per pound for castings and the market price for all other material used. Payments were to be made the 15th of each month. The order further provided "said machine to be built at the earliest possible date and all patterns and designs for same to accompany and be delivered to the undersigned as his exclusive property. It being distinctly understood that you are to make no machine or machines for making the wire fence for any other parties without my written consent." At the same time this order was given under date of May 30th, an agreement was entered into between A. J. Bates and Robinson for the formation by them of a corporation for the purpose of manufacturing and marketing woven wire fence, with a capital stock of $100,000 to be divided equally between them. The agreement provided that appellant should at his own expense invent and patent a machine for the manufacture of woven wire fence that would make three hundred rods of fence in ten hours, that the machine should be made at the works of the Bates Machine Company upon the order and at the expense of Robinson, and when completed should be turned over to the corporation to be organized under the agreement. The agreement

Bates v. Bates Machine Co.

further provided that Bates should obtain a patent in his own name (which had already been applied for), for a woven wire fence according to drawings accompanying the application, a copy of which was attached to the agreement, and turn over and transfer it also to the corporation when organized and in consideration of the transfer of these patents, $50,000 paid up stock of the corporation should be issued to Bates and his wife. By the terms of the agreement Robinson was to pay into the treasury of the corporation $10,000 less the cost of manufacturing the machine, and $50,000 paid up stock was to be issued to him and his wife in full of his subscription, "it being the object and intention of this agreement to set off and equalize as between the parties hereto the cash capital of ten thousand dollars to be furnished by the party of the first part (Robinson), against the inventions, designs, patterns and improvements of the party of the second part (Bates), as aforesaid." A trial proved both the fence and the machine unsatisfactory and the machine was never completed.

The organization of the corporation contemplated under the agreement between Bates and Robinson was completed October 4, 1895, under the name of Standard Railroad & Farm Fence Company, which will hereafter be called the Standard, and after abandoning the machine that had proved a failure, work was begun on a new machine designed by A. J. Bates for the manufacture of a new design of fence invented by him also. There was no order nor agreement in writing concerning the manufacture of the new machine. Appellant testified he and Robinson, after the machine they first worked on had been abandoned, "substituted a suitable fence and machine for it so that we were able to carry out what we originally intended." The order for the machine under the contract of May 28th, was entered in the order book by W. O. Bates under date of June 1, as order number 6342 and was as follows: "One special wire fence machine, making spaces as per blue print." January 7, 1896, appellant entered in the order book, "Order 7072 C. E. Robinson special wire fence machine, drawings. Order 7073 C.

E. Robinson special wire fence machine, patterns. Order 7074 C. E. Robinson special wire fence machine, machine shop work and material." The first of these orders is explained by appellant to mean that appellee would have to make drawings for the machine before making patterns, the second that it should make the patterns after the drawings were made, and the third meant work done in the shop and material used. The new machine was completed in June, 1896, and after testing it from June 12th to July 12th, it was pronounced satisfactory and was taken from appellee's shops July 14th. July 24th Cory E. Robinson signed a paper to which was attached his order of May 28, 1895, transferring all his rights, title and interest in the contract and the machine constructed thereunder, including the pattern and designs for the same, to the Standard Company, and on the following day the latter company assigned it to the Consolidated Steel & Wire Company.

This transfer to the Consolidated Steel & Wire Company, which will hereafter be referred to as the Consolidated Company, was made in pursuance of an agreement entered into with it, September 14, 1895, by A. J. Bates, C. E. Robinson and the Standard Company. The substance of this agreement was that Bates, Robinson and the Standard Company would sell and deliver to the Consolidated Company the machinery and effects of the Standard Company, including " a certain woven wire fence machine, now being built under the superintendence of A. J. Bates, together with such patents as may be obtained on either the machine or its products." The consideration agreed to be paid by the Consolidated Company was $40,000 cash and $40,000 more when certain conditions specified were complied with by the other parties. As a part of the consideration it also agreed to pay Bates and Robinson the actual cost of material and supplies of the Standard Company on hand and to assume the performance of certain contracts between them and their company with other parties and cancel a contract it had with them to sell them a certain amount of wire. The contract also provided:

"It is further understood and agreed that the Standard Railroad and Farm Fence Company will, at their own expense (except the salary of A. J. Bates as hereinafter agreed), build a certain woven wire fence machine, for manufacturing a certain woven wire fence, substantially like the drawing hereto attached, said machine to be completed at the earliest possible moment. After the completion of said machine the Standard Railroad and Farm Fence Company are to notify the Consolidated Steel and Wire Company that said machine is ready for inspection, and then at the end of thirty days' successful operation of said machine, and if the workings of the machine and product of same are satisfactory to the officials of the Consolidated Steel and Wire Company, it is agreed that the said device, improvements and patents, such as may be obtained for both the machine and its product, shall be assigned to the Consolidated Steel and Wire Company, who shall be the absolute owners of said device, patents and machine from this date; and said Consolidated Steel and Wire Company shall then pay the further consideration of forty thousand dollars ($40,000) in cash to the said Standard Railroad and Farm Fence Company. It is understood that until the completion of this machine, A. J. Bates is to be in the employ of the Consolidated Steel and Wire Company under a salary of four thousand dollars ($4,000) per year, and he is to give his entire and exclusive attention, services and skill to the early completion and perfection of said machine and the business of said Consolidated Steel and Wire Company."

June 12, 1896, appellant notified the Consolidated Company that the machine contemplated by the contract was completed and ready for operation according to the terms of the contract. Representatives of the Consolidated Company went to appellee's works at different times during the thirty days the machine was being tested and observed its operation. After the test was finished the machine appears to have been loaded on cars for shipment to Robinson, but it was in fact delivered to the Consolidated Company. Patents were procured on the fence and the machine for making it and were caused to be issued to the Consolidated Company "on the application of A. J. Bates, assignor," and thereafter that company claimed to be the sole owner of the patents on the machine and the fence and to have

exclusive right of their manufacture. Appellee claims that by virtue of the contract and agreement between A. J. and W. O Bates and Joseph Winterbotham of June 28, 1888, these inventions of A. J. Bates became its property and that he could not lawfully dispose of them to other parties without its consent, and appropriate the proceeds to his own use. This suit is an action on the case begun in the Circuit Court of Will County in December, 1901, against A. J. Bates to recover damages for fraud and deceit in the alleged violation of that contract. To the declaration appellant filed four pleas, viz.: first, the general issue, the second and third were special pleas not necessary here to set out for the reason that appellant was not denied the benefit of any testimony that would have been applicable under those pleas; in fact, they amounted to the general issue. The fourth plea was the five-year Statute of Limitations. A demurrer was sustained to the second, third and fourth pleas, issue joined on the first, a jury waived and trial had before the court resulting in a judgment in favor of appellee for $55,800 and costs, from which this appeal is prosecuted.

Before the commencement of this suit appellee had brought a suit in chancery and prosecuted it to final judgment in the Supreme Court, against appellant, Robinson, and the Consolidated Company, to compel the assignment to it of the patents and rights to the inventions here involved. The Consolidated Company filed a cross-bill in that suit claiming to be the rightful owner of these patents and praying a decree confirming and quieting its title. The Supreme Court held the Consolidated Company had in good faith contracted for the inventions and paid a large sum of money thereon before notice of appellant's claim, and that the work of devising the inventions and manufacturing the machine was carried on at appellee's works under such circumstances of apparent acquiescence by appellee, and for so long a period of time before it gave notice of its claim, that it would be inequitable to deprive the Consolidated Company of the patents, and the decree of

the Circuit Court dismissing the original bill and granting the prayer of the cross-bill was affirmed. Bates Machine Co. v. Bates, 192 Ill. 138.

It is first insisted that an action on the case will not lie, and secondly, that if case will lie the action was barred by the five-year Statute of Limitations and that the court erred in sustaining the demurrer to defendant's fourth plea. The right to sue in case for damages resulting from the breach of a contract is sustained by 1 Chitty on Pleading, 135, Buswell on Limitations and Adverse Possession, Sec. 215, Nevins v. Pullman Palace Car Co., 106 Ill. 236, and Howard v. Ritchie, 9 Kan. 71. In the section above cited from Buswell it is said: "Where the tort is the result of a breach of contract, the limitation which applies to actions of contract and not that which applies to actions of tort, controls." The opinion in Howard v. Ritchie, *supra*, was by Mr. Justice Brewer and is as follows: "The petition sets forth a contract for services; that the services were to be rendered with care and skill; that they were carelessly and negligently performed; that in consequence thereof the personal property of plaintiff was injured, and that the carelessness and negligence was the sole cause of the injury. The transaction is alleged to have happened more than two and less than three years before the commencement of the suit. The District Court held that this action came within the provisions of the third clause of section 18 of the Civil Code, which limits to two years the bringing of actions 'for taking, detaining or injuring personal property,' and hence was barred. In this we think the learned judge erred. The action is one for breach of contract. The breach of the contract gives the right to relief. The injury to the property determines the amount of damages. The legitimate order of evidence under the petition would be, first, the contract, then the breach, and last the amount of damages. The fact that the breach of the contract resulted in injury to the specific personal property would not reduce the time within which an action might be brought below that which a

party would have in case of any other breach of contract. The time, if the contract be in writing, is five years, otherwise three. The plaintiff's cause of action was not barred, and the judgment of the District Court must be reversed."

We conclude, therefore, that the action was not improperly brought in case and that the court did not err in sustaining a demurrer to the plea of the Statute of Limitations.

It is further insisted that on the merits of the case there can be no recovery because the patents and inventions were of articles of commerce in no wise connected with the business appellee was incorporated to perform, and also because prior to their invention appellant had by his acts and conduct absolved himself from the obligation of the contracts of January 28, 1888. We are of opinion the inventions were not foreign to the business appellee was engaged in. The business of Bates Brothers as shown by their business card on the paper upon which their agreement with Winterbotham was written, was " Machinists; special machinery of all kinds, jobbing and repairing; inventors and manufacturers of special machinery,"—and it certainly was not outside of appellee's line to manufacture machines of the character here in controversy. Before the incorporation of appellee, the Bates Brothers had been engaged in inventing and manufacturing barbed wire machines. They held patents on such machines at the time the agreement of June 28, 1888, was made and under the agreement these became the property of appellee. The Bates Brothers were, as their business card states, " Machinists, Inventors and Manufacturers of Special Machinery." One of the objects of combining their skill with Winterbotham's capital was stated in the contract to be the desire " of extending and enlarging the present business." The business of the corporation as stated in the application for authority to organize was to be, " general machine and foundry work and the manufacture of tools and furnishings." That this was intended by the parties and understood by them to include the manufacture of

barbed wire machines is not and cannot be denied. Their
business included the manufacture of such machines of. their
own invention, or those designed and invented by some one
else. We see no reason for holding that while the manu-
facture of barbed wire machines was in their line, the
manufacture of woven wire machines was not. Woven
wire fence was a development of the wire fence business
and the manufacturing of machinery to make it was as
much within the scope of appellee's business as the manu-
facture of barbed wire machines. This was recognized by
the parties in the making and performance of a contract
with the Ellwood Company under date of December 1,
1894, for the manufacture of woven wire fence machines
designed from machines that company already had in op-
eration, with such necessary improvements as appellee
thought best to add, the drawings, patterns, improvements
and patents to belong to the Ellwood Company. The ma-
chine involved in this case was a valuable invention and
the control of it would have been of great profit and value
to appellee, and not being outside of the scope and purpose
for which appellee was organized, the agreement under
which the corporation was formed obligated appellant to
turn over and secure to the corporation or to such person
or company as it designated, the patent, as had been
previously done with numerous inventions of A. J. and W.
O. Bates, unless he was released from that obligation in
some manner. While it may be the manufacture and sale
of woven wire fence was not within the contemplation of
appellee, we are of opinion the control of a patent on a
fence designed and invented to be manufactured on the ma-
chine invented by appellant would be a valuable adjunct to
the right to control the manufacture and sale of the machine,
and as incident to and in connection with that right it
cannot be said the invention and patent of the fence was
not controlled by the contract above mentioned. We do
not think it an unreasonable construction of that contract
to say that it bound the Bates Brothers to give to appellee
the use and control of all inventions and patents designed

for, and which tended to promote the prosperity of the
business in which it was legitimately engaged. Before a
machine could be designed to make the fence there must
be some design of a fence to be made. We can hardly
imagine how a machine could be designed and manufactured
to make a fence of which no design had been made or
formed. If there was no fence for the machine to make,
the machine would be valueless; and if there was no ma-
chine. to make the fence designed, the fence would be val-
ueless. When this contract was before the Supreme Court
in the chancery suit, before referred to, that court held it
to be a valid contract and legally binding on the Bates
Brothers to assign to the corporation such inventions of
each of them " as pertained to the special business in which
the parties, through the medium of the corporation, in-
tended to engage."

Appellant testified that W. O. Bates, superintendent of
appellee, was familiar with the Robinson order of May 28,
1895, and that it was entered in the books by him. That
he, appellant, designed a machine under that order and
worked on it till he had enough of it completed to test it,
when it was found the machine and the fence it was de-
signed to make were unsatisfactory, and in the latter part
of December it was abandoned and work begun on another
machine a few days later; that the machine was manufac-
tured at Robinson's risk and was paid for by him; that
when the original machine was abandoned the new one was
designed and constructed under the original order and in
accordance with a personal contract between him and Rob-
inson, which was agreed upon and prepared on the same day
of the Robinson order to appellee for the machine, but
which bore date May 30, 1895. Appellant offered this con-
tract in evidence, the substance of the most material parts
of which are above referred to.

The final certificate of the organization of the corpora-
tion under the agreement, was issued to it under the name
of the Standard Railroad & Farm Fence Company, Octo-
ber 4, 1895, but was never filed for record as required by

law.   Appellant says that when the original machine and
fence proved failures, he and Robinson " substituted a suit-
able fence and machine, so that we were able to carry out
what we originally intended."   Appellant testified that the
Standard Company was organized for a variety of wire
business, but not being ready to manufacture woven wire
fence, began the manufacture of barbed wire and wire nails
the last of August and ceased the 18th of September; that
he superintended fitting up the Standard plant and devoted
practically all his time to it from the fore part of August
to the latter part of September, 1895; and that appellee
furnished a good deal of the work and supplies and W. O.
Bates, the superintendent, Winterbotham, the president,
and Wolcott, assistant secretary of appellee, had knowledge
of the equipping of the plant while it was going on.   He
further testified that the machine constructed under the
Robinson order was intended for use by the Standard Com-
pany and that he had numerous conversations with W. O.
Bates in which he told him all about his interest in the
Standard Company, and what they proposed to do.   He
also testified that just prior to the completion of the new
machine he discovered appellee was charging Robinson for
his, appellant's, time; that he objected to this and gave as
his reason that he was personally interested in the Stand-
ard Company and was receiving a salary from the Consoli-
dated Company; that W. O. Bates was frequently at the
Standard Company's plant on Sundays and met and talked
with him and Robinson about their business.   Appellant
also introduced in evidence two newspaper articles pub-
lished in Joliet newspapers, one under date of August 20,
1895, and one under date of September 19, 1895.   In one of
them it was stated that Al Bates, of the Bates Machine
Company, was the principal mover in a new company which
would manufacture coarse woven wire for farm fencing
and the plant would be ready for operation early the next
month.   In the other it was stated the Standard Railroad
& Farm Fence Company was the name of a concern in
which the Bates Brothers were interested, and that its

product was to be woven wire fence. In September, 1895, he says the Standard Company ceased operations because it sold out to the Consolidated Company. As a matter of, fact this was done before the final certificate of incorporation was issued to the Standard Company and no stock was ever issued by it. The contract of sale of the Standard Company to the Consolidated was made September 14, 1895, and is above referred to and quoted in part, and appellant testified the $40,000 cash payment was made by the Consolidated Company about the time the contract was executed; that he told W. O. Bates about the deal before the sale was closed and showed him a check for something over $19,000 he received from the Consolidated Company on the cash payment and told him of his employment by that company at a salary of $4,000 per year; that the thirty days' test of the machine was witnessed by the president, vice-president, general manager and other officers and directors of the Consolidated Company at appellee's works at different times while it was in progress; that the wire used in making the test was furnished by the Consolidated Company and the fence made, delivered to and hauled away in its wagons. On the 25th of July, 1896, after the Consolidated Company had notified appellee it was satisfied with the machine, appellant, Robinson, and the Standard Company assigned to the Consolidated Company the pending application for letters patent to the invention and all improvements made or to be made thereon and requested in the assignment, that the commissioner of patents issue the letters patent and all extensions to the Consolidated Company. Appellant says he entered the employment of the Consolidated Company at a salary of $4,000 per year, on the day after the contract of September 14th was made, and remained in its employ until the completion of the machine and so continued thereafter at the same salary; that he received his salary from that company by check and that W. O. Bates knew about it because he told him of it; that he and his brother both used the same desk and that he had there that company's letter heads, bill heads and advertising matter and did the corresponding for it from appellee's

office, and its stenographer made copies of letters he wrote in the back part of its letter press copy book, which he sometime afterwards tore out. He further testified he did not remember to have mentioned the contract of September 14th with the Consolidated Company and his employment by it to any of the officers of appellee other than his brother, W. O. Bates, except Mr. Mott, the vice-president, and that he told him about it September 25, 1895, just before the meeting of the board of directors held on that date. On that day appellant resigned his position of secretary and treasurer of appellee and was elected consulting engineer, which position he held till February, 1897. He also said that when the machine and fence he first worked on proved to be a failure, which was in December, 1895, he told W. O. Bates he felt very badly about it because of his contract with Robinson and the Consolidated Company, and that he believed he would not tell them about it until he had tried a new design of machine and fence; that he did at once design a new fence which Robinson and the Consolidated Company agreed to accept; that he told W. O. Bates about changing the order numbers and that W. O. Bates said he did not care so long as Mr. Robinson's contract was not interfered with. The work, he says, was all done at appellee's place of business under his directions and was paid for either by Robinson, or by the Standard Company by checks to which the corporation's name was signed " by A. J. Bates." Appellant further testified that on the 25th of September, 1895, he told Mr. Mott, then a director and vice-president of appellee, about the sale of the Standard Company to the Consolidated Company, what the consideration was and of his employment by the latter company, and that he thought the subject was mentioned after the directors' meeting had adjourned in the presence of the directors, W. O. Bates, Winterbotham and Mott.

It would extend this opinion beyond reasonable limits to advert to and attempt an analysis of all the testimony bearing on this feature of the case, and we will not further attempt it.

We have read it all, oral and documentary, and the con-
clusions we have reached as to what the testimony proves
are based on the whole evidence.

W. O. Bates, Mott and Winterbotham all deny appellant
ever had the conversations with them he testified to having
about his contract with and relations to Robinson, the
Standard Company and the Consolidated Company. W. O.
Bates testified, and is corroborated by Wolcott, that when
the former saw the order of Robinson for the machine, he
objected to the terms of it and stated to appellant as the
work was to be done at so low a price it should have pro-
vided that appellee should have exclusive right to build
other like machines Robinson might want. Appellant re-
plied, "That is all right. You know if Robinson wants
any more machines he will come here and get them be-
cause of our experience in building this one." W. O. Bates
said the order did not say that, and appellant replied,
"That don't make any difference. The wire is Robinson's
and the fencing; we couldn't control that anyhow." This
must strike any one as peculiar language if appellant had
determined to absolve himself from the obligations of his
contract with appellee and wanted it to have notice of that
fact. If he wanted it to know of his real relations with
Robinson and their objects and purposes, here was a very
opportune time to have informed it. That he did not do so
and not only concealed these relations and purposes, but
actually misrepresented the facts, we think must be accepted
as proved by the weight of the testimony. The weight of
the proof also shows that the contract between appellant
and Robinson of date May 30th, which was prepared at the
same time and by the same attorney as the order for the
machine dated May 28th, was a secret contract between
the parties to it, and was never known to the appellee until
long afterwards when litigation arose over the control of
the inventions and patents. Appellant does not claim he
ever told any one connected with appellee about the con-
tract of September 14th between himself, Robinson and the
Standard Company and the Consolidated Company until

after the deal was closed and the cash payment of $40,000 made. This deal was consummated several days before the directors' meeting at which appellant resigned his position as secretary and treasurer, and all those whom appellant testified he notified of it on that day flatly deny that he did so, and testify they had no knowledge then of what appellant's intentions were with reference to these inventions or that he was the author of them, or of his having entered the employment of the Consolidated Company. They knew of his being interested in the Standard Company, but did not know of any purpose it had of manufacturing woven wire. Some, or all of them, had been at its plant and all they saw was the machinery for the manufacture of barbed wire and wire nails. These men all testify that after the directors' meeting and on the same day, appellant said he had sold or was about to sell his interest in the Standard Company to the Consolidated Company. They did not, however, at that time understand he claimed or pretended that this sale included inventions of his own, which they claim under the contract belonged to the corporation. W. O. Bates testified at the time of the directors' meeting he had no knowledge of appellant being interested with Robinson in the machine, and Winterbotham testified that on the occasion of his visit to the Standard's building the day of, but after the directors' meeting was held, appellant told him he was associated with Robinson and others in the wire nail business but declined to give the names of his other associates. Mr. Winterbotham says he had spoken to appellant about his being engaged in some outside business and of his fears that he might involve appellee in some of his contracts and that this was the cause of his visit with appellant to the works. W. O. Bates testified appellant said at the meeting he had sold out his business at the Standard's work and both he and Winterbotham say appellant said he would be able in the future to devote more of his time to appellee's business than he had been doing. If appellant had severed his obligations with appellee under the contract of June 28, 1888, and if he had

entered the employment of another corporation at a salary
of $4,000 per year, why did he accept employment at a
salary with appellee and express himself as being able on
account of having sold out his other business, to give
appellee more of his time than he had done before? It
is not reasonable to suppose if appellee had known he
was devoting his time to inventions of his own concep-
tion, which, when patented were to be owned and controlled
exclusively by another corporation which was paying him
a salary at the rate of $4,000 per year while he was en-
gaged in the work, and had also agreed to pay him a large
sum of money for the inventions and patents completed
and procured, that it would also have employed and paid
him a salary during the same time. The minutes of the
meeting at which appellant was employed as consulting
engineer of appellee and his salary fixed at $100 per month,
recite that he is " to assist when desired in taking orders and
to give his best efforts to the advancement of the inter-
ests of the Bates Machine Company." Appellant does not
say that any of the officers or directors of appellee with
whom he says he talked, ever said a word about his being
released from his contract. That subject, according to his
testimony, was never mentioned by him nor any one else.
It would appear to any reasonable mind we think, that if
he was engaged in developing and constructing inventions
of his own conception which he believed would be of great
value and did not intend the benefits thereof to accrue to
appellee under his contract with it, he would not have been
content to rest his right to claim absolution from the con-
tract wholly upon such facts and circumstances as are
shown by the evidence in this case. Appellant was no
novice in the matter of making contracts and making
business transactions of a complicated character. He is a
shrewd, intelligent man, and as his testimony shows, thor-
oughly familiar with the English language. If he had in-
tended appellee to know of his purpose to put an end to
his obligations under the contract, he is too intelligent not
to know that the best way to do it was by a direct and full

statement and disclosure of such intention. While this may not have been absolutely necessary, and while notice might have been given by acts and declarations, we take it such acts and declarations must have been of no uncertain character. They must have been inconsistent with appellant's duty under the contract, and such that appellee could not reasonably have misunderstood his intention. The Supreme Court said in Bates Machine Company v. Bates, *supra:* "After that period (two years) either of the parties had full right to absolve himself from the contractual relations created by the agreement. But to accomplish this, affirmative action on his part was essential, either an actual declaration made to the other co-contracting parties, or some acts brought to their knowledge amounting to such a declaration, from which such notice would be imputed by law, as effectually as by an express formal declaration. The other parties were entitled to know that such course had been determined upon." The "other parties" referred to by the Supreme Court in the language above quoted, swear they did not know it and in our opinion the proof does not show any such acts and declarations as that it can be said they were bound to know it. Stress is laid on appellant's testimony that he and his brother, W. O. Bates, occupied the same desk at appellee's works and of his receiving mail there and writing letters and having them copied in the back of appellee's letter press copy book, and that W. O. Bates must have seen them. In addition to the fact that W. O. Bates testified he never saw any of appellant's correspondence or copies of letters written by him in the letter press copy book, the value of this testimony is further impaired by the testimony of appellant that after his brother had opened a letter addressed to appellee, but which was intended for appellant and related to a contemplated purchase of wire for the Standard Company, he caused mail addressed to him individually and as secretary of appellee, to be delivered to him at his residence. He also says he attempted to have this done from the date of the contract with Robinson, May 30, 1895,

up to the time of the sale of the Standard to the Consolidated Company.  He says he did this because he did not consider his private business was the business of appellee. He did not conceal nor attempt to conceal the fact from appellee that he was interested at the Standard works in the manufacture of barbed wire and wire nails.  The only private business he was interested in which he concealed from appellee, so far as the record discloses, was his contracts with Robinson and the Consolidated Company, and the fact that he was the inventor of the machine and fence. If he wanted and intended appellee to know of these things, why so particular about having his mail sent to his residence instead of appellee's shops where he worked?  The Supreme Court said in the case referred to that " A. J. Bates could not be permitted to enjoy the benefits of the agreement and secretly absolve himself from its duties and obligations on his part;" yet it appears to us from this testimony that this is precisely what he attempted to do. Until long after the completion and patenting of the inventions, he retained his stock in appellee, continued to be a director therein and hold a salaried position.  It is clear from the by-laws that it was not intended by the corporation that its stock should ever go upon the open market. By them it was provided that the directors should have a preference to purchase the stock of any one who wanted to sell.  Whether this was a valid provision or not, it evidences the fact that the stock was believed to be very desirable and it was intended that it should be kept within the circle of those then interested in the corporation.  It may be appellant could, if consented to by the directors and officers of appellee, be relieved from the performance of his part of the agreement of January 28th, while retaining his stock, his position as a director and as a salaried officer in the corporation and receiving all the benefits of the contract that might accrue to him as the result of his brother's inventions and the use of the capital furnished by Winterbotham.  It would, however, seem a most extraordinary and unusual thing for the other parties to said agree-

ment to consent without any consideration or benefit to them whatever, that the contract should remain in force, and binding upon all parties to it except appellant, and that as to him he should be released from its obligations, but should retain and receive all the benefits of it so far as it related to the other parties to it. A thing so unusual must be supported by clearer and a greater weight of evidence than is to be found in this record before it can be accepted as proven. While W. O. Bates was not as skillful in invention as A. J., still he was an inventor and was so recognized by the contract, and as the contract still bound him to give appellee the benefit of his inventions, by retaining his stock in appellee, appellant retained the right to share in their benefits and to participate in the management and control of the corporation. While it is true, facts and circumstances occurred during the period the machine was being perfected and completed that might well be considered sufficient to apprise appellee that the Standard Company claimed the inventions and towards the close of that period that the Consolidated Company claimed some interest in them, nothing in these facts and circumstances informed appellee that appellant was the author of them. It was appellant's duty under his contract to make a full disclosure to appellee of all his inventions during the existence of the contract. Farwell v. Great Western Tel. Co., 161 Ill. 522; Mitchell v. McDougall, 62 Ill. 498. This he not only failed to do, but the weight of the evidence shows he concealed and misrepresented the fact of his authorship of the inventions. Under such circumstances if appellee knew of and acquiesced in the claim of the Standard and Consolidated companies to the patents, it could not have the effect to relieve appellant from the terms of his contract. Before that effect could result it must appear that appellee knew the fact of his being the originator and designer of the inventions. Such knowledge coming to appellee after the inventions had been designed and nearly completed, and after the secret contracts with the Standard and Consolidated companies for their disposal had been made, could

not prejudice its rights under the contract, to the inventions as between it and appellant.

It is also contended by counsel for appellant that his resignation, September 25, 1895, of the office of secretary and treasurer was notice to appellee that he had elected to terminate his agreement. They say no course of conduct could have been more effectual to terminate that contract than "his resignation of the employment which was the sole consideration upon which was based the obligation to devote his energies and inventions to the business of appellee." As we understand and construe the contract of January 28, 1888, appellant's employment as secretary and treasurer was not the sole nor the principal consideration for his agreement, and his duty to assign his inventions to appellee was not made to depend upon such employment. While it is true the contract stipulates who shall be the officers of the corporation when organized and what the salaries of the secretary and treasurer and superintendent shall be, these provisions are independent of the real consideration for the contract, which was that the Bates Brothers were to put in the concern the property and effects of the business they were then conducting, " also all patents now in existence and all inventions hereafter made by either the said A. J. Bates or W. O. Bates. *In consideration of the above*, Joseph Winterbotham agrees to put in ten thousand dollars," etc. There is no intimation in this agreement that if any of the parties therein agreed upon for officers of the corporation, should at any time cease to be such officer, the agreement would thereby be annulled. Moreover, appellant's retirement from the office of secretary and treasurer and the duties imposed upon that office by the by-laws was voluntary on his part. There is not the slightest evidence that his resignation was demanded or requested. For aught that appears from this record outside of appellant's own subsequent statements, his reasons for resigning were to be relieved from the exacting duties imposed upon the person holding that office by the by-laws. He had been engaged for some time in fitting up a plant ostensibly for

the manufacture of barbed wire and wire nails. It had actually been in operation for these purposes a few days. At the directors' meeting September 25th, he told the directors he had sold out this business, but did not according to the weight of the proof tell them then or at any other time that he was the author of the inventions involved in this suit, nor that he had contracted their use and control to the Consolidated Company. Nothing occurred, so far as shown by the record of the directors' meeting, to indicate that appellant's resignation was intended or understood to have any other effect than to relieve him from the duties of the office of secretary and treasurer. At the same time he assumed the duties of another office which required him "to give his best efforts to the advancement of the interests of the Bates Machine Company." If it was intended that appellant was thenceforth to have the right to control and dispose of his inventions to whom he pleased and for his own individual account, it would seem reasonable that some mention should have been made of it in the proceedings of the board of directors. It was a matter of great importance to both parties, and especially does it look unreasonable that appellant should have failed to have some record made of a matter so vital to him. All the record that was made at that meeting is inconsistent with the claim that it was notice to appellee of appellant's purpose to withdraw from the agreement to give appellee the benefit of his inventions.

July 1, 1896, appellee having become aware of the fact that appellant was the author of the inventions and having received such information as led them to believe the Consolidated Company made some claim to them, caused a notice to be mailed to John Lambert, vice-president and general manager of that corporation, that under an existing contract, appellee claimed all inventions made or patented by either A. J. or W. O. Bates, and requesting that corporation to deal directly with appellee with regard to woven wire fencing and machinery for making it. On the 14th of the same month the machine was loaded on cars for Robinson, and W. O. Bates gave appellant a receipt for him to have Robinson sign before taking possession. Rob-

inson refused to sign the receipt, replevied the machine and delivered it to the Consolidated Company. This appears to have brought the controversy to an acute stage and resulted in an agreement being entered into between appellant and appellee, Joseph Winterbotham and W. O. Bates, September 10, 1896, for the purpose of trying to arrive at some settlement of at least a part of the controversy. If anything were wanting to show conclusively that appellant did not understand or regard the contract of January 28, 1888, annulled by any of the parties to it previous to that time, it is found in this agreement. It recited that "Whereas, the Bates Machine Company was organized in accordance with the provisions of a certain writing now existing, dated January 28, 1888, by Albert J. Bates, William O. Bates and Joseph Winterbotham, * * * and whereas, differences have arisen between said Albert J. Bates and said corporation as to the effect of said writing, which differences it is proposed to settle amicably," and then recited that appellant had made application for letters patent for an egg-case machine and a wire barbing machine, and had also made application September 1, 1896, for letters patent for a machine for a design of woven wire fence (the last mentioned machine and the fence being the inventions here involved), and that appellee claimed the right to the manufacture, sale and use of all these inventions and that appellant denied such right to appellee, and then provided that appellee thereby relinquished any right to demand of appellant any interest in any inventions he might thereafter make and released him "from any claim had or held by it (appellee) by virtue of said writing of date Jan. 28, 1888, or otherwise, to any right to one or the other of the inventions designated hereinafter as egg-case machine or the woven wire fence machine, as it may hereafter elect in writing, leaving to said Albert J. Bates the entire, sole and complete right thereto of such machine so relinquished to said A. J. Bates." This agreement further provided that as to the wire barbing machine and whichever one of the other two mentioned appellee should elect to claim the right to under the agreement, "said writing of date Jan.

Bates v. Bates Machine Co.

28, 1888, shall be and remain in full force and effect." The agreement gave appellee the right to enforce whatever claims it might have in and to said inventions in any proceeding in any court it might determine upon and "to insist upon a right to, interest in, or use of said inventions, and to use for such purpose said writing of date January 28, 1888." The third clause of the agreement provided that as to the inventions appellant might thereafter make, "said writing of January 28, 1888, is hereby abrogated, annulled and cancelled." This agreement from beginning to end recognizes the existence of the contract of January 28, 1888, and is wholly antagonistic to appellant's present contention that he claimed the right to the inventions and their use and control on the ground that he had before they were invented, terminated his obligations with appellee under the contract. It seems clear to us that the real basis of his claim was that the inventions were not within the purview of the contract because they were not "such as pertained to the special business in which said parties, through the medium of the corporation, intended to engage." This proposition we have held not tenable and it then necessarily follows that the inventions and patents, therefore, belonged to appellee under contract of January 28, 1888.

If appellant is, as we hold, liable to appellee for damages, the measure of such damages adopted by the trial court was as favorable to appellant as he could insist upon. That was, the amount received by him from the Consolidated Company—$40,000 and the interest from the date of its receipt. Upon the theory that Robinson had no knowledge of the contract of January 28, 1888, and that his means contributed to the successful development of the inventions, we are of opinion this was the proper rule for the assessment of the damages. The propositions of law held and refused by the trial court were in harmony with the views herein expressed and the judgment is affirmed.

*Affirmed.*

Mr. Justice DIBELL took no part in the consideration of this case in this court.